## Vincent P. DUANE

### v.

## GOVERNMENT EMPLOYEES INSURANCE CO., et al.

### Civ. No. HM–91–2654.

United States District Court,
D. Maryland.

Feb. 7, 1992.

Vincent P. Duane, pro se.

Jerome V. Bolkcom, Washington, D.C., for plaintiff.

Thomas Waxter, Jr., Kristine A. Howanski, Semmes, Bowen & Semmes, Baltimore, Md., for defendants.

## MEMORANDUM

HERBERT F. MURRAY, Senior District Judge.

The plaintiff, Vincent P. Duane, brought this action for discrimination under 42 U.S.C. § 1981 against the defendants, Government Employees Insurance Company and GEICO General Insurance Company (collectively "GEICO"). Presently before

the Court is the motion of the defendants to dismiss the complaint pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.[1]

## I. FACTUAL SUMMARY

■ This Court recognizes the long-accepted rule that

the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is a "short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.... The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.

*Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) (footnote omitted). Consequently, a court may grant a motion to dismiss "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). For the purposes of deciding a motion to dismiss, this Court must take the material allegations of the complaint as admitted by the defendants, *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969), and further must construe those allegations favorably to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Duane is a lawfully admitted, permanent resident alien of the United States of America and a citizen of Australia. On June 3, 1991, Duane contacted GEICO in an effort to obtain insurance for his newly purchased home. In response to a question from the sales agent, Duane disclosed his citizenship status. The sales agent then informed Duane that GEICO would not

1. Today's ruling renders moot the defendant's motion to stay discovery until decision on this motion.

write homeowner's insurance for him because he was not a United States citizen.

Duane next spoke with one of GEICO's supervisory personnel. The supervisor, Ms. Henderson, confirmed that GEICO had a policy of refusing to enter into contracts of homeowner's insurance with non-United States citizens. However, Ms. Henderson indicated to the plaintiff that, notwithstanding his citizenship status, he could obtain homeowner's insurance from GEICO if first he agreed to purchase a policy of auto insurance.

Distressed by GEICO's refusal to insure him, the plaintiff filed a complaint with the Maryland Department of Licensing and Regulation, Insurance Division on June 5, 1991. Upon receiving notice of that complaint, GEICO offered a policy of homeowner's insurance to the plaintiff. Having by that time purchased such a policy from another insurance carrier, the plaintiff refused.

Duane also filed this action, pursuant to 42 U.S.C. § 1981. The plaintiff seeks $50,000 in compensatory damages and $100,000 in punitive damages, as well as a declaratory judgment condemning GEICO's policy of denying homeowners insurance to aliens and enjoining GEICO from continuing that practice.

## II. MOTION TO DISMISS

GEICO raises several arguments in support of its motion to dismiss the complaint. First, GEICO argues that the complaint presents no case or controversy. Second, GEICO maintains that § 1981 does not provide Duane with a cause of action in this case. Third, GEICO asserts that, under the McCarran–Ferguson Act, § 1981 does not apply to the business of insurance. Lastly, should this Court reject those arguments, GEICO urges this Court to abstain from deciding the case. This Court will address each of these arguments in turn.

### A. *Case or Controversy*

Plaintiffs who seek to invoke the jurisdictional power of the federal courts first must satisfy the threshold requirement imposed by Article III of the United States Constitution by alleging a case or controversy, U.S. Const. art. III, § 2, cl. 1, for federal courts have no power to issue advisory opinions, *United States v. Fruehauf*, 365 U.S. 146, 157, 81 S.Ct. 547, 553, 5 L.Ed.2d 476 (1961), and only may decide "questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). The plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990). The requirement that parties have a personal stake in the outcome of the litigation ensures the clash of adversary argument upon which the courts largely depend for illumination of difficult questions. The competing interests that drive the adversary system help to sharpen the presentation of issues to the court and to explore all possible aspects of often intricate and multifaceted situations. *See Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); *Fruehauf*, 365 U.S. at 157, 81 S.Ct. at 553.

In this case, the complaint seeks $50,000.00 to compensate for the "continuing embarrassment, humiliation, indignity, distress and injury to reputation [caused by] GEICO's refusal to contract with him based solely upon his alienage." Complaint ¶ 29. Although GEICO ignores those allegations in its motion to dismiss,[2] nothing in that motion indicates that "interim relief or events have completely and irrevocably eradicated" those damages.

---

**2.** Urging this Court to disregard the allegations of damages because "these allegations are not set forth in the body of the Complaint," Motion to Dismiss at 2, n. 2, GEICO states: "Plaintiff alleges that he has suffered damages, but at this point, we can only surmise what those damages

may be as none have been alleged in the Complaint." GEICO Motion at 2. This Court rejects GEICO's myopic and outdated reading of the Complaint. *See Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).

*See Los Angeles County v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). Having alleged that he has suffered damages "fairly traceable to the defendant's acts or omissions," the plaintiff has satisfied the requirements of Article III with respect to those claims. *Scott v. Greenville County,* 716 F.2d 1409, 1414 (4th Cir.1983) (*quoting Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977)). This Court is satisfied that, in his efforts to recover damages for the injuries alleged in the complaint, the plaintiff will provide the earnest, zealous, and exhaustive advocacy essential to the adversary system and contemplated by the Constitution.

■ The plaintiff also seeks relief in the form of a declaratory judgment, which would find that GEICO's discriminatory practice violates § 1981 and permanently would enjoin that practice in the future. GEICO argues that, because the plaintiff refused its offer of homeowner's insurance and obtained insurance elsewhere, the controversy has become moot in regard to declaratory relief.

> The Declaratory Judgment Act provides: In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). The Act applies "only in respect to controversies which are such in the constitutional sense." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–40, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937). Such a controversy must require "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be on a hypothetical state of facts." *Id.* at 241, 57 S.Ct. at 464. "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *White v. National Union Fire Ins. Co.,* 913 F.2d 165, 167–68 (4th Cir.1990).

■ Even if a controversy in the constitutional sense exists at first, a case can become moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). In this case, Duane obtained homeowner's insurance elsewhere. As a result, he no longer has a "real interest in 'live' issues" pertaining to GEICO's *future* insurance practices. *See Kennedy v. Block,* 784 F.2d 1220, 1222 (4th Cir.1986). A judicial decree enjoining GEICO's discriminatory practice in the future would neither redress an injury or threat of injury to the plaintiff nor affect significantly his rights or his position in this lawsuit. *See Lewis,* 494 U.S. at 477, 110 S.Ct. at 1253. Consequently, no case or controversy "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" exists to support the claims for declaratory and injunctive relief.

■ Duane argues that a controversy exists because GEICO's policy with respect to non-United States citizens falls within the exception to the mootness doctrine for questions "capable of repetition, yet evading review." *Sosna v. Iowa,* 419 U.S. 393, 399–403, 95 S.Ct. 553, 557–59, 42 L.Ed.2d 532 (1975); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). That exception applies where "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Lewis,* 494 U.S. at 481, 110 S.Ct. at 1255 (quoting *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (*per curiam*)

(quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975))).

■ In his complaint, the plaintiff in this case fails to allege facts to establish either requirement. With respect to the first requirement, nothing about the discriminatory policy at issue makes judicial review of that policy unlikely because the passage of time necessarily would moot any challenge. *See Sosna*, 419 U.S. at 400, 95 S.Ct. at 557 (state residency requirement); *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973) (pregnancy); *Reigh v. Schleigh*, 595 F.Supp. 1535, 1539 (D.Md.1984) (collecting cases). With respect to the second requirement, in response to the motion to dismiss, the plaintiff asserts that if he "purchases another piece of property and attempts to secure a contract of insurance from GEICO for that property, he will be denied because he is an alien." Duane Response at 13. However, hypothetical fact situations cannot support a claim for declaratory relief. In the event that GEICO in fact refuses to insure the plaintiff in the future, "there will be ample time to obtain judicial review of the denial." *Lewis*, 494 U.S. at 482, 110 S.Ct. at 482.

In sum, because Duane has alleged monetary damages arising from the actions of the defendant, those claims satisfy Article III by stating a case or controversy. However, the plaintiff's claims for declaratory and injunctive relief, based upon GEICO's hypothetical refusal to insure the plaintiff in the future, does not satisfy that requirement, and this Court therefore will dismiss those claims.

B. Failure to State a Claim

1. Section 1981

42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and

enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

In the history of § 1981, courts have spent a great deal of paper and ink reviewing and analyzing the legislative history of the section. *See McDonald v. Santa Fe Transp. Co.*, 427 U.S. 273, 285–96 & nn. 15–26, 96 S.Ct. 2574, 2581–86 & nn. 15–26, 49 L.Ed.2d 493 (1976); *Runyon v. McCrary*, 427 U.S. 160, 168 n. 8, 96 S.Ct. 2586, 2593 & n. 8, 49 L.Ed.2d 415 (1976); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422–37 & nn. 28–73, 88 S.Ct. 2186, 2194–2202 & nn. 28–73, 20 L.Ed.2d 1189 (1968) (analyzing § 1982); *Espinoza v. Hillwood Square Mut. Ass'n*, 522 F.Supp. 559, 561–64 (E.D.Va.1981); *De Malherbe v. International Union of Elevator Constructors*, 438 F.Supp. 1121, 1136–42 & nn. 14–27 (N.D.Cal.1977). Consequently, this Court will review the legislative history of the section only briefly and refer liberally to the work done by other courts.

After the ratification of the Thirteenth Amendment to the United States Constitution,[3] Congress overrode a presidential veto to enact the Civil Rights Act of 1866, which provided

That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime where the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell,

---

**3.** Neither slavery nor involuntary servitude, except as a punishment for a crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Congress shall have power to enforce this article by appropriate legislation.

U.S. Const. amend. XIII.

hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding. Act of April 9, 1866, ch. 31, § 1, 14 Stat. 27. With the 1866 Act, Congress sought "to secure to all citizens of every race and color ... those fundamental rights which are the essence of civil freedom." *The Civil Rights Cases*, 109 U.S. 3, 22, 3 S.Ct. 18, 29, 27 L.Ed. 835 (1883). By its terms, therefore, the 1866 Act applied only to 'citizens,' and thus provided no protection against discrimination on the basis of alienage. *De Malherbe*, 438 F.Supp. at 1136.

The Fourteenth Amendment was ratified in 1868 and Congress subsequently enacted the Civil Rights Act of 1870 ("1870 Act"). Sections 16, 17, and 18 of the 1870 Act, initially proposed by Senator Stewart of Nevada as S.365, extended the protections afforded by § 1 of the 1866 Act to aliens:

SEC. 16. *And be it further enacted,* That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void.

SEC. 17. *And be it further enacted,* That any person who, under color of any law, statute. ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court.

SEC. 18. *And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April nine, eighteen hundred and sixty-six, is hereby re-enacted; and sections sixteen and seventeen hereof shall be enforced according to the provisions of said act.

Act of May 31, 1870, ch. 114, §§ 16–18, 16 Stat. 140, 144. By its terms, § 16 applied to "all persons within the jurisdiction of the United States" and thereby extended protections contained in § 1 of the 1866 Act to aliens. Further, by virtue of § 18, § 1 remained in force and was enforced in concert with § 16.

Unfortunately, contemporaneous Congressional action confuses the issue. When Congressionally authorized recodifiers assembled the federal statutes into the Revised Statutes of 1874, the new § 1977, later § 1981 in its present form, purported to spring solely from § 16, with no mention of either § 18 or the 1866 Act. *Runyon*, 427 U.S. at 168 n. 8, 96 S.Ct. at 2593 n. 8. However, that reviser's note did not constitute a repeal of the 1866 Act, in part because the recodifiers never expressed an intention to repeal it. On the contrary, the Supreme Court has held that Congress understood that the terms of § 1981 combined elements from both § 16 of the 1870 Act and § 1 of the 1866 Act. *Id.*

Determining to what degree each section remained in force after the 1874 recodification forms the heart of the issue in this case. In support of its motion to dismiss,

GEICO argues that a claim under § 1981 must include an allegation of racial discrimination. Alternatively, GEICO maintains that, even if the protections of § 1981 extend to non-United States citizens, it does not reach *private* alienage discrimination.

### 2. Alienage

■ It is well established that § 1981 applies to private racial discrimination. *Patterson v. McLean Credit Union,* 491 U.S. 164, 171, 109 S.Ct. 2363, 2369, 105 L.Ed.2d 132 (1989); *Runyon,* 427 U.S. at 168–69, 96 S.Ct. at 2593–94; *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). Thus, § 1981 protects "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987).

■ However, § 1981 does not ban every kind of discrimination. For example, nothing in the language or history of the section addresses discrimination on the basis of either sex or religion. *Runyon,* 427 U.S. at 167, 96 S.Ct. at 2592. Additionally, § 1981 does not provide protection for individuals discriminated against on the basis of national origin, *Al–Khazraji,* 481 U.S. at 613, 107 S.Ct. at 2028,[4] age, *Kodish v. United Airlines, Inc.,* 628 F.2d 1301 (10th Cir.1980), handicap, *Simon v. St. Louis County Police Dep't,* 14 Fair Emp.Prac. Cas. (BNA) 1363, 14 Empl.Prac.Dec. (CCH) ¶ 7703, 1977 WL 859 (E.D.Mo.1977), *aff'd in part, rev'd in part,* 656 F.2d 316 (8th Cir.1981), sexual orientation, *Grossman v. Bernards Township Bd. of Educ.,* 11 Fair Emp.Prac.Cas. (BNA) 1196, 11 Empl.Prac. Dec. (CCH) ¶ 10,686, 1975 WL 302 (D.N.J. 1975), *aff'd,* 538 F.2d 319 (3rd Cir.1976), *cert. denied,* 429 U.S. 897, 97 S.Ct. 261, 50 L.Ed.2d 181 (1976), or political ideology. *Stiessberger v. Rockwell Int'l Corp.,* 29

Fair Empl.Prac.Cas. (BNA) 1273, 31 Empl. Prac.Dec. (CCH) ¶ 33,419, 1982 WL 509 (E.D.Wash.1982). Although § 1981 does not extend to these groups, however, many courts have held that § 1981 applies to discrimination on the basis of alienage. *Graham v. Richardson,* 403 U.S. 365, 377, 91 S.Ct. 1848, 1855, 29 L.Ed.2d 534 (1971) (citing *Takehashi v. Fish and Game Comm'n,* 334 U.S. 410, 419 n. 7, 68 S.Ct. 1138, 1143 n. 7, 92 L.Ed. 1478 (1948)); *Bell v. City of Milwaukee,* 746 F.2d 1205, 1232 (7th Cir.1984) ("§ 1981 ... protects against discrimination on the basis of race or alienage"); *Espinoza,* 522 F.Supp. at 561 ("section 1981 also prohibits alienage discrimination"); *De Malherbe,* 438 F.Supp. at 1140 (§ 1981 prohibits "state laws that denied equal protection to aliens"); *Sud v. Import Motors Ltd., Inc.,* 379 F.Supp. 1064, 1071 (W.D.Mich.1974) ("Sec. 1981 by its terms applies to all persons within the jurisdiction of the United States, and thus plainly embraces aliens").[5]

Despite these clear judicial assertions, GEICO argues that alienage discrimination falls outside the scope of § 1981. In support of this argument, GEICO cites certain case law that holds that one must allege racial discrimination in order to state a claim under § 1981. Such case law falls into two categories—cases similar to *Al–Khazraji* but decided before that case, and cases that did not address the issue of alienage.

In the first category, GEICO cites this Court's decision in *Martinez v. Hazelton Research Animals, Inc.,* 430 F.Supp. 186 (D.Md.1977), which involved an Hispanic male plaintiff. Holding that an allegation of Hispanic origin alone would not support a claim of racial discrimination under § 1981, this Court directed the plaintiff to amend his complaint to allege discrimination on the basis of race. *Martinez,* 430 F.Supp. at 188. *See also Lopez v. Sears,*

---

**4.** One must distinguish 'ancestry or ethnic characteristics' on the one hand from 'place or nation of origin' on the other. As Justice Brennan noted in *Al–Khazraji,* although no bright line exists between the two concepts, § 1981 prohibits discrimination based only on the former.

481 U.S. at 614, 107 S.Ct. at 2028 (concurring opinion).

**5.** Again, one must distinguish 'place or nation of origin' on the one hand from 'country of citizenship' on the other. *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973).

*Roebuck and Co.,* 493 F.Supp. 801, 807 (D.Md.1980) (explaining the holding in *Martinez*). GEICO cites *Martinez* for the proposition that a claim under § 1981 must be styled as a claim of *racial* discrimination. Ten years later, however, the Supreme Court wrote:

> Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended to forbid, whether or not it would be classified as racial in terms of modern scientific theory.

*Al–Khazraji,* 481 U.S. at 613, 107 S.Ct. at 2028. By extending the protections of § 1981 beyond technically racial discrimination to include ethnicity, the Court in *Al–Khazraji* plainly disapproved of the limited reading of § 1981 found in cases like *Martinez.*

Further, in nearly all of the cases cited by GEICO, the courts failed even to address the issue of alienage, let alone hold that § 1981 did not apply to alienage discrimination. GEICO places a great deal of weight on statements such as, " '[§ 1981] was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any *race.*' " *McDonald,* 427 U.S. at 295, 96 S.Ct. at 2586, *quoted in* GEICO Reply at 8–9 (emphasis added by GEICO). GEICO argues that such a statement demonstrates that § 1981 applies exclusively to racial discrimination. *See* GEICO Reply at 7 ("The Supreme Court has consistently interpreted [§ 1981] as prohibiting only *racial* discrimination") (emphasis in original).

However, the fact that the Court in *McDonald* failed to address alienage discrimination cannot be equated with a holding that § 1981 does not extend to such discrimination. The issue of alienage discrimination simply was not before the Court in that case. Accordingly, this Court will follow the overwhelming majority of courts

that have addressed the issue directly and hold that § 1981 prohibits alienage discrimination. *See e.g., Graham,* 403 U.S. at 377, 91 S.Ct. at 1855 ("The protection of [§ 1981] has been held to extend to aliens as well as citizens").

3. Private Alienage Discrimination

█ Alternatively, GEICO argues that the plaintiff has failed to state a claim under § 1981 because that section does not apply to private alienage discrimination. In support of that argument, GEICO cites *Bhandari v. First Nat'l Bank of Commerce,* 829 F.2d 1343 (5th Cir.1987) (*en banc*) (7–6 decision), and *De Malherbe v. International Union of Elevator Constructors,* 438 F.Supp. 1121 (N.D.Cal.1977).

In *Bhandari,* the defendant bank denied credit to the plaintiff because, although he was a lawful permanent resident alien, he was not a United States citizen. After examining the case law interpreting § 1981, the Fifth Circuit concluded that § 1981 did not apply to private alienage discrimination. *Bhandari,* 829 F.2d at 1351–52. The Fifth Circuit reached that conclusion based in part upon a belief that the Supreme Court wrongly decided the cases of *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) and *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976):

> However laudable its cause and purpose, the reasoning which led the Supreme Court to construe § 1981 as reaching private racial discrimination has now been called into serious question by three present members of the Court itself, as well as by the late Justice Harlan and by retired Justice Powell. In these circumstances, it would be inappropriate for us to extend that reasoning across the board to forbid all private alienage distinctions....

*Id.* at 1351; *see also id.* at 1349 ("The issue is whether, because the Supreme Court reasoned in a particular manner on one subject, we are obliged to extend that reasoning, when it seems to us—and not to us only—severely flawed....").[6]

---

6. The Supreme Court granted *certiorari* and re-

manded the case to the Fifth Circuit for recon-

The plaintiff in *De Malherbe*, a permanent resident alien of the United States and a citizen of Uruguay, alleged that the defendant union refused to hire him because of his citizenship status. The court held that, although § 1981 applied to public alienage discrimination, it did not extend to private acts of alienage discrimination. *De Malherbe*, 438 F.Supp. at 1140. In a thorough opinion that painstakingly traced § 1981's legislative history, the court concluded that

> Congress' exclusive concern was with state laws that denied equal protection to aliens. The recurrent references throughout the Senate and House debates to provisions to enforce the Fourteenth Amendment, which by its terms applies only to state action, suggest that these provisions were directed at state action.

*Id.* at 1140. Based on the reasoning and holdings in *Bhandari* and *De Malherbe*, GEICO argues that § 1981 does not apply to the private alienage discrimination alleged in Duane's complaint.

In support of his argument that § 1981 applies to private as well as public alienage discrimination, Duane cites *Espinoza v. Hillwood Square Mut. Ass'n*, 522 F.Supp. 559 (E.D.Va.1981). The defendant in *Espinoza*, a cooperative housing association, refused to give membership applications to the plaintiffs, alien residents of the United States. After a thorough examination of the legislative history, the court in *Espinoza* held that § 1981 applied to private alienage discrimination. *Id.* at 564. After reviewing the reasoning used by the courts in *Bhandari*, *De Malherbe*, and *Espinoza*, and conducting an independent examination of the relevant historical authorities, this Court agrees with the court in *Espinoza* that § 1981 provides a cause of action for private alienage discrimination.

First, Senator Stewart's comments about the bill that would become §§ 16–18 of the 1870 Act disclose an intent to extend the protections of the 1866 Act to aliens. On February 24, 1870, Senator Stewart said:

> The original civil rights bill protected all persons born in the United States in the equal protection of the laws. This bill extends it to aliens, so that all persons who are in the United States shall have the equal protection of our laws. It extends the operation of the civil rights bill, which is well known in the Senate and to the country, to all persons within the jurisdiction of the United States.

Cong.Globe, 41st Cong., 2nd Sess. 1536 (1870). Thus, Senator Stewart intended to extend the protections of "the original civil rights bill," the 1866 Act, to aliens. Given that extension, the 1870 Act prohibits private alienage discrimination in the same manner that the 1866 Act prohibits private racial discrimination.

The court in *De Malherbe* rejected this argument. Focusing on Senator Stewart's understanding that the 1866 Act provided only "equal protection of the laws," that court concluded that Senator Stewart intended § 16 to extend the protections of the 1866 Act only to public acts of discrimination. *De Malherbe*, 438 F.Supp. at 1137–38. The court in *De Malherbe* noted further that Senator Stewart stated, in the same debate, that his bill "simply extends to foreigners, not citizens, the protection of our laws where the State laws deny them the equal civil rights enumerated in the first section" of the bill. Cong.Globe, 41st Cong., 2nd Sess. 1536 (1870).

However, this Court doubts that Senator Stewart could have misunderstood the scope of the 1866 Act, given the scope of the debate in the Senate concerning that Act. *See Jones*, 392 U.S. at 429–35, 88

---

sideration in light of its recent reaffirmation of the application of § 1981 to private racial discrimination in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). *Bhandari v. First National Bank of Commerce*, 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558, *reh'g denied*, 492 U.S. 937, 110 S.Ct. 22, 106 L.Ed.2d 635 (1989). On remand, the Fifth Circuit reinstated its prior opinion in a *per*

*curiam* opinion, noting only that the Court in *Patterson* failed to address the specific issue of whether § 1981 applied to alienage discrimination, and that the six judges who dissented from the prior opinion remained outnumbered. *Bhandari v. First National Bank of Commerce*, 887 F.2d 609, 610 (5th Cir.1989), *cert. denied*, 494 U.S. 1061, 110 S.Ct. 1539, 108 L.Ed.2d 778 (1990).

S.Ct. at 2197–2201 (discussing the Senate debates). Further, with respect to the Senator's latter statement, the second section of S.365 (later § 17) in fact extended the protections of the 1866 Act to aliens where state action denied them the civil rights secured in the first section of the bill. That statement did not limit the application of § 16 to private alienage discrimination.

Indeed, any interpretation that limits the application of § 16 to purely public acts of alienage discrimination would make redundant much of § 17, which established criminal liability for anyone who deprived any person of the rights protected by § 16, but exempted private persons from such liability. If § 16 proscribed only public alienage discrimination, then no private violations of § 16 would exist for § 17 to exempt.[7]

Whereas the court in *Espinoza* relied on this argument, the court in *De Malherbe* rejected it. However, the court in *De Malherbe* already had concluded that, whereas the 1866 Act clearly applied to private action, nothing in the legislative history of the 1870 Act supported applying § 16 to private discrimination. *De Malherbe*, 438 F.Supp. at 1141. As noted above, this Court disagrees with that interpretation of the legislative history, finding instead that Senator Stewart meant for his bill to extend the protections of the 1866 Act to aliens.

Finally, although the opinions in *Bhandari* and *De Malherbe* demonstrate no lack of reasoned analysis, this Court fears that those courts have missed the forest for the trees. Simply put, nothing in the language of § 1981 indicates that courts should apply it to prohibit private and public racial discrimination but only to prohibit public alienage discrimination. That § 1981 prohibits private racial discrimination is beyond dispute. *Patterson*, 491 U.S. at 175, 109 S.Ct. at 2372. As noted above, § 1981 also applies to alienage discrimination. Notwithstanding the intricacies and ambiguities of the statute's legislative history, logic requires that § 1981 necessarily

must prohibit private acts of alienage discrimination as well.

Holding otherwise, the majority in *Bhandari* distinguished between racial and alienage discrimination:

> The question is whether in this day and time we should link together inseparably the legal protections accorded all persons against race-prejudice by their fellows in our society with those accorded the foreign nationals among us against alienage discrimination. Reflection persuades us that they would be curious mates in harness: the impulses that might move Smith, a white United States citizen, say, to discriminate against Jones, a black United States citizen, are unlikely, we think, to bear much in common with those which might move him to discriminate against Kirov, a Ukranian citizen of the U.S.S.R. legally resident in this country—let alone against Lopez, an illegal Mexican immigrant. Yet § 1981, which commences with the phrase "All persons within the jurisdiction of the United States," applies equally to Jones, Kirov, and Lopez, if given its broad, literal meaning. It has been said that there is no greater injustice than to treat unequal things equally, and we are not disposed to do so in this instance unless the Congress has clearly demanded it. This it has not done in the instance of § 1981, a statute of all but Constitutional sweep and breadth; and, for the reasons that follow, we decline to yoke § 1981's protections against alienage discrimination to those against discrimination on racial grounds.

*Bhandari*, 829 F.2d at 1344–45 (footnote omitted).

Unlike the majority in *Bhandari*, this Court does not view Smith, Jones, Kirov, and Lopez as "unequal things," but rather ascribes to the ideal that "all men are created equal." The Declaration of Independence para. 2 (U.S.1776), *cited in Bhandari*, 829 F.2d at 1354 (dissenting opinion). Consequently, this Court holds that § 1981 prohibits private discrimination based upon

---

**7.** This argument paraphrases a similar argument made by the Supreme Court in their interpretation of § 1 of the 1866 Act. *See Jones*, 392 U.S. at 424–26, 88 S.Ct. at 2195–96.

alienage. If Smith, a xenophobic citizen of the United States, refuses to make a contract with Kirov or Lopez based solely upon the fact that they are citizens of another country, then § 1981 affords Kirov or Lopez a right of action for damages resulting from that refusal.[8] Because the plaintiff in this case claims exactly that sort of injury, he has stated a claim upon which this Court can grant relief.

### C. *McCarran–Ferguson Act*

 GEICO argues further that, even if it extends to private acts of alienage discrimination, § 1981 does not restrict the activities of insurance companies by virtue of § 2 of the McCarran–Ferguson Act, 15 U.S.C. § 1012. That Act provides:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b).

Congress enacted the McCarran–Ferguson Act in response to the holding of the Supreme Court in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), in which the Court held that Congress could regulate the insurance industry pursuant to its Commerce Clause power, and specifically that the federal antitrust laws applied to insurance companies. *Id.* at 553, 64 S.Ct. at 1174. Until that time, insurance commonly was thought to fall outside the scope of the Commerce Clause, and that the regulation of the insurance industry rested exclusively with the states. *SEC v. National Securities, Inc.*, 393 U.S. 453, 458, 89 S.Ct. 564, 567, 21 L.Ed.2d 668 (1969).

 After Congress enacted the McCarran–Ferguson Act, the courts developed a four-step procedure for determining whether the Act precluded application of a particular federal statute to the business of insurance. If the federal statute does not relate specifically to insurance, the court next must determine whether the challenged activities constitute the business of insurance for purposes of § 1012(b). If so, the court must determine whether the state in question has enacted any law for the purpose of regulating those activities. If such state legislation exists, the court finally must decide whether application of the federal statute would "invalidate, impair, or supersede" that law. *Cochran v. Paco, Inc.*, 606 F.2d 460, 464 (5th Cir.1979).

As must be clear from the discussion above, Congress enacted § 1981 with more than just the insurance industry in mind. This Court therefore must determine whether the discriminatory practices alleged by the plaintiff constitute the 'business of insurance' under the McCarran–Ferguson Act.

 Although the McCarran–Ferguson Act primarily protects the insurance industry from the operation of the antitrust laws, it can preempt other federal statutes that encroach upon state regulation of the 'business of insurance.' *See First Nat'l Bank of Eastern Arkansas v. Taylor*, 907 F.2d 775 (8th Cir.1990) (applying § 1012 to the National Bank Act, 12 U.S.C. §§ 21–216d); *Gordon v. United States Dep't of Treasury*, 846 F.2d 272 (4th Cir.1988) (priority of United States claims pursuant to 31 U.S.C. § 3713); *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419 (4th Cir.1984) (Fair Housing Act, 42 U.S.C. §§ 3604, 3617 and Civil Rights Acts of 1866 and 1870, 42 U.S.C. §§ 1981, 1982). When considering the effect of the McCarran–Ferguson Act, courts have concluded with near uniformity that the preemptive reach of the Act must be narrowly construed. *Anglin v. Blue Shield of Virginia*, 693 F.2d 315, 320 (4th Cir.1982) ("it is readily apparent that the courts, including this one, have often given a narrow interpretation of the term ['business of insurance']").

---

**8.** This Court does not decide the issue whether § 1981 would apply if Smith refused to make a contract with Lopez based solely on the fact that Lopez has violated United States immigration law.

In *Group Life & Health Ins. Co. v. Royal Drug Co., Inc.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), the Court examined the scope of the 'business of insurance' category. Holding that certain pharmacy contracts did not constitute the 'business of insurance,' the Court identified three characteristics relevant to determining whether particular activities fall within that narrow category:

> *first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.

*Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982) (summarizing the criteria set forth by the Court in *Royal Drug*). This narrowly drawn three-prong test confirms that "[i]nsurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the statute apply." *National Securities,* 393 U.S. at 459–60, 89 S.Ct. at 568.

In this case, the plaintiff alleges that GEICO refused to underwrite a policy of homeowner's insurance for him based solely on the fact that he was not a citizen of the United States. Such a practice failed to transfer the policyholder's risk because it effectively prevented Duane from becoming a policyholder in the first place. "The transfer of risk from insured to insurer is effected by means of the contract between the parties—the insurance policy—and that transfer is complete at the time that the contract is entered." *Pireno,* 458 U.S. at 130, 102 S.Ct. at 3009. The absence of any actual transfer of risk weighs against the application of the McCarran–Ferguson Act in this case.

With respect to the second prong listed above, "the party seeking the protection of the McCarran–Ferguson Act must show that the challenged priority scheme is 'related positively to underwriting and ratemaking.'" *Gordon v. United States Dep't of Treasury,* 668 F.Supp. 483, 490 (D.Md.

1987), *aff'd,* 846 F.2d 272 (4th Cir.1988) (quoting *State of Maryland v. Blue Cross and Blue Shield,* 620 F.Supp. 907, 917 (D.Md.1985)). In this case, GEICO makes only conclusory statements to the effect that its allegedly discriminatory practice is "an integral part" and lies "at the core of" the 'business of insurance.' Supplemental Motion at 7. That failure to demonstrate a positive relation between the policy of refusing to underwrite aliens and the general practice of underwriting and ratemaking also weighs against applying the McCarran–Ferguson Act in this case.

Finally, the challenged practice in this case—alienage discrimination—is not at all limited to insurance companies. Because the allegedly discriminatory policy fails to constitute the 'business of insurance,' the McCarran–Ferguson Act will not preempt the application of § 1981 in this case.

GEICO asserts that, because underwriting policies play an integral part in the 'business of insurance,' *see Elliott v. ITT Corp.,* 764 F.Supp. 102, 104 (N.D.Ill.1991) ("There can be no doubt that the sale of an insurance policy is the business of insurance"), the McCarran–Ferguson Act preempts the application of § 1981 to those policies, no matter how discriminatory they may be. But, as the Supreme Court has noted:

> The McCarran–Ferguson Act was an attempt to turn back the clock, to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation. As the House Report makes clear, '[i]t [was] not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the *Southeastern [South–Eastern] Underwriters Association* case.'

*National Securities,* 393 U.S. at 459, 89 S.Ct. at 568 (quoting H.R.Rep. No. 143, 79th Cong., 1st. Sess., 3 (1945)). Traditional state regulation focused on the relationship between the insurer and the insured,

to prevent insolvency and maintain the sound financial condition of the company. *See SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 90–91, 79 S.Ct. 618, 632, 3 L.Ed.2d 640 (Brennan, J., concurring). Individual civil rights and discrimination in the making and enforcement of contracts, on the other hand, have little to do with preventing insolvency and have been the proper subject of federal regulation for over a century.

### D. *Jurisdiction and Abstention*

■ Lastly, because the plaintiff filed a similar action with the Maryland Insurance Commission ("MIC"), GEICO sets forth two arguments why this Court should not exercise its jurisdiction in this case. GEICO asserts that the MIC has exclusive jurisdiction to decide the plaintiff's claims and also that the existence of a 'complex state regulatory scheme' requires this Court to abstain from hearing this case.

In support of its argument that the MIC has exclusive jurisdiction over the claims in this case, GEICO cites *Magan v. Medical Mut. Liab. Ins. Soc.*, 81 Md.App. 301, 567 A.2d 503 (1989). In *Magan,* the defendant insurance company refused to underwrite a policy of malpractice insurance for the plaintiff, a physician. The court in that case held that the physician could not maintain a tort action in the Circuit Court for damages separate from but on the same issues involved in the proceedings before the Insurance Commissioner. *Magan,* 81 Md.App. at 308–09, 567 A.2d 503.

In further support of its argument, GEICO cites Maryland statutory law, which provides:

> Notwithstanding any other provisions of law, the Commissioner shall have exclusive jurisdiction to enforce by administrative action the laws of the State as they relate to the underwriting or rate setting practices of an insurer, except that the Human Rights Commission shall have concurrent jurisdiction over alleged discrimination on the basis of race, creed, color or national origin.

Md.Ann.Code art. 48A, § 25(4)(a). However, neither this statute nor the holding in *Magan* apply to the facts of this case. The exclusive jurisdiction of the Insurance Commissioner extends to actions brought under Maryland law, not federal law. Duane's claim before this Court is based on federal civil rights laws, not Maryland law. GEICO has not cited a case that vests in the Maryland Insurance Commissioner exclusive jurisdiction over claims brought pursuant to federal law.

■ Even if the Insurance Commissioner does not have exclusive jurisdiction over this case, GEICO argues, this Court should abstain from deciding this case. Citing *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), GEICO argues that the Maryland Insurance Code is a 'complex state regulatory scheme' within the meaning of the *Burford* doctrine of abstention.

This Court first notes the general rule that

> [a]bstention from the exercise of federal jurisdiction is the exception, not the rule. 'The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.'

*Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)).

The Supreme Court described the *Burford* doctrine concisely in a recent case:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with re-

spect to a matter of substantial public concern.'

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (quoting *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1244). This Court need not reach the issue of whether this case falls within either of the two categories cited by the court, however, because the case at bar fails to satisfy one of the basic requirements for abstention under the *Burford* doctrine; namely, that the federal court be sitting in equity. Having dismissed Duane's claims for declaratory and injunctive relief as moot, no claims in equity remain before this Court. Consequently, the *Burford* doctrine does not apply in this case.

## III. CONCLUSION

Finding no case or controversy sufficient to support the plaintiff's claims for declaratory and injunctive relief, this Court will dismiss those claims. With respect to the remaining claims for damages, because this Court finds that § 1981 applies to private acts of alienage discrimination and that the McCarran–Ferguson Act does not preempt the application of § 1981 in this case, this Court will deny the defendants' motion to dismiss the complaint.