Ossama **NAGY, et al.,** Plaintiffs,

v.

**BALTIMORE LIFE INSURANCE COMPANY, et al.,** Defendants.

**No. Civ. AMD 96–3673.**

United States District Court, D. Maryland.

May 24, 1999.

George Wadie Hermina, John Wadie Hermina, Laurel, MD, Houeida Saad, Alexandria, VA, for plaintiffs.

Barrett W. Freedlander, Saul, Ewing, Weinberg & Green, Baltimore, MD, Stanley Mazaroff, Venable Baetjer & Howard, Baltimore, MD, for defendants.

## MEMORANDUM

DAVIS, District Judge.

The plaintiffs, Ossama Nagy, Sherif M. Saad, Nooshin Soozangar and Shagufla Azad, are four non-United States citizens having Arabic ancestry. In their second amended complaint, they allege that defendant Baltimore Life Insurance Company and one of its affiliated insurance compa-

nies (together, "Baltimore Life") discriminatorily, in violation of 42 U.S.C. § 1981, rejected their applications for life insurance on the basis of race and alienage. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. Pending before the court, *inter alia,* is the defendants' motion for summary judgment.[1] Counsel have fully briefed the issues presented and a hearing has been held. For the reasons set forth below, I shall grant defendants' motion for summary judgment.

## PRELIMINARY ISSUES

*Motion to Quash Deposition Subpoena to Maryland Insurance Commissioner*

Pending before the court is a motion to quash a deposition subpoena duces tecum or, alternatively, motion for protective order, filed by the Maryland Insurance Commissioner ("Commissioner"), in respect to an effort by plaintiffs to conduct third party discovery from the Maryland Insurance Administration. The motion is granted for the reasons stated herein.

After this case had been pending for almost a year, one of plaintiffs' counsel wrote a letter to the Commissioner on behalf of the American Arab Anti–Discrimination Committee ("AAADC") asserting that AAADC had received "numerous complaints from [its] members [who] . . . have been discriminated against by Baltimore Life," and requesting the Commissioner to "revoke the license" of Baltimore Life. The Commissioner promptly responded, indicating that he regarded the allegations as very serious, and informing the AAADC that his agency would perform a "market conduct" examination of Baltimore Life

concerning the allegations. A "market conduct" examination is one of several types of regulatory investigations authorized under Maryland law. *See* Md.Code Ann. Ins. Art. § 2–205, *et seq.*

The Commissioner conducted the examination during the period October 27-November 13, 1997. It involved a site visit to the Baltimore Life offices, a detailed review of thousands of pages of documents and interviews of Baltimore Life personnel. Pursuant to statute, see *id.* at § 2–209(c), a "proposed" report of the examination was provided to Baltimore Life. Thereafter, apparently, significant modifications were made to the "proposed" report and a final report of examination—concluding that Baltimore Life had not violated Maryland law by discriminating on the basis of citizenship in its underwriting practices—was formally filed with the Commissioner. The Commissioner's report is discussed in detail *infra.*

In the course of discovery, seizing on Baltimore Life's admission that favorable modifications had been made to the "proposed" report after Baltimore Life had been given an opportunity to respond to the Commissioner's proposed findings and conclusions, plaintiffs caused deposition subpoenas duces tecum to be issued to two current employees and one former employee of the Maryland Insurance Administration regarding work they performed on the Commissioner's behalf during the market conduct examination. The intended deponents were requested to produce "correspondence, notes and memos relating to market conduct examinations of Baltimore Life between 1994 and 1998 including . . .

---

**1.** Defendants have moved to amend their answer to the second amended complaint, which was docketed on April 30, 1998, and which defendants answered, after preliminary motions, on October 16, 1998. Defendants seek to add two affirmative defenses: (1) failure to mitigate damages and (2) limitations as to plaintiff Azad's claims. Defendants assert that leave to amend is warranted because they uncovered information only during discovery that provides support for the omitted defens-

es. Although, in the ultimate view of the case I adopt, those defenses are not germane (and mitigation need not be affirmatively plead (*see* Fed.R.Civ.P. 8(c)), the defenses shall be allowed. *See DelCostello v. Int'l Brotherhood of Teamsters, Chauffeurs and Warehousemen and Helpers of America,* 588 F.Supp. 902, 905 (D.Md.1984) (refusing to impose a waiver of unasserted limitations defense), *aff'd,* 762 F.2d 1219 (4th Cir.1985).

all documents utilized in generating the reports and all documents supplied to the unit by Baltimore Life."

After an exchange of correspondence between counsel for plaintiffs (whose letters were remarkably acerbic) and the Assistant Attorney General representing the Commissioner, the Commissioner filed his motion to quash or for protective order. In his motion, the Commissioner relies on four distinct grounds: (1) the Commissioner is prohibited by state law from disclosing information concerning any matters involving preparation of a market conduct report, see id. at § 2–209(g)[2]; (2) Maryland state court decisional authority supports the nondisclosure of the information sought by plaintiffs' subpoena; (3) executive privilege; and (4) the medical and other personal information provided by individual life insurance applicants (and contained in the documents covered by the subpoena) is confidential.

It is well-settled that "[t]he scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules." *Jackson v. Brinker*, 147 F.R.D. 189, 193–94 (S.D.Ind.1993). Pursuant to Fed.R.Civ.P. 45(c)(3)(iii), a person may move to quash a subpoena seeking the disclosure of "privileged or other protected matter." The Commissioner has done so here. (Plaintiffs' objection to the timeliness of the Commissioner's motion is not well taken, has not demonstrated that plaintiffs were prejudiced by any delay, and the Commissioner's efforts to resolve the dispute prior to filing the motion to quash is to be encouraged rather than sanctioned.).

■ I have fully considered the arguments advanced by the Commissioner and the plaintiffs for and against compelling disclosure of the material sought by plaintiffs. I am persuaded that the Commissioner has satisfied his burden to demonstrate that weighty public and private interests support recognition of a privilege under the facts and circumstances presented in the case at bar to withhold from plaintiffs the documents and testimony they seek. *See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318 (D.D.C.1966) (discussing and applying, *inter alia*, deliberative process privilege in the context of a motion under Fed.R.Civ.P. 45), *aff'd per curiam on the reasoning of the district court*, 384 F.2d 979 (D.C.Cir.), *cert. denied sub nom. V.E.B. Carl Zeiss, Jena v. Clark*, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967); *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir.1991) (citing *Carl Zeiss Stiftung* with approval); *see also United States v. Cartledge*, 928 F.2d 93, 95–97 (4th Cir.1991) (identifying elements of balancing test which informs federal court's exercise of discretion whether to recognize state-created privileges under F.R.E. 501; interpreting *United States v. Gillock*, 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980)); *Hartsell v. Duplex Products, Inc.*, 895 F.Supp. 100 (W.D.N.C.1995) (applying balancing test; state-created privilege applied in federal employment discrimination action), *aff'd*

---

**2.** Under § 2–209(g):

[T]he [Insurance] Commissioner may disclose a preliminary examination report, investigation report, or any other matter related to an examination made under § 2–205 or § 2–206 of this subtitle ... only to the insurance regulatory agency of another state or a federal, state, local, or other law enforcement agency.

Md.Code Ann. Ins. Art § 2–209(g)(1) (1997). Under the statute, even if the Commissioner chooses to disclose to the identified agencies information related to—but not contained

in—a published market conduct report, the Commissioner may do so only on condition that: (a) the disclosures are made for regulatory or law enforcement purposes; (b) the agency to which the information is communicated agrees in writing to keep the disclosures confidential; and (C) the Commissioner is satisfied that the agency will preserve the confidential nature of the information. *Id.* at § 2–209(g)(2). Once an examination report is made final, it becomes a public document. *Id.* at § 2–209(g)(3).

*on other grounds,* 123 F.3d 766 (4th Cir. 1997).

Plaintiffs have persisted in calling the "proposed" report of the market conduct examination the "first" report. In fact, the Maryland regulatory scheme specifically contemplates that an insurer will have an opportunity to respond to the Commissioner's "proposed" report prior to its publication as a "final" report and that, necessarily, the Commissioner should consider any response before filing his final report. *See* Md.Code Ann. Ins. Art. § 2–209(c)(1).[3] It is not unexpected that modifications may result in the Commissioner's findings and conclusion as a consequence. Thus, as a matter of law, there was no "first" report as plaintiffs insist; the Commissioner properly delivered to Baltimore Life his "proposed" report.

Moreover, although the plaintiffs have attempted to narrow their requests to exclude disclosure of information revealing the Commissioner's deliberative processes, the plaintiffs long had broad access to all of the "facts" surrounding the Commissioner's investigation directly from Baltimore Life during discovery. Thus, the only "material," whether or not such "material" is loosely described as "facts," in the possession of the commissioner to which plaintiffs did not otherwise have ready access during discovery are the Commissioner's own analyses of the underlying data and his evaluative and deliberative synthesis of the information he obtained from the books and records of Baltimore Life. The final published report, which plaintiffs have received and which is discussed *infra,* contain all of the relevant facts on which the report is based.

For the reasons stated, therefore, in light of the important interests implicated in fostering unimpeded state control over (and public and industry confidence in) the state's regulatory role in respect to the business of insurance, balanced against the minimal showing by plaintiffs of their need for and of the likely probative value of the disputed material, the Commissioner's motion to quash is granted.

*Defendants' Motion to Exclude the Testimony of Adel Alalfey*

■ Defendants have moved *in limine* to exclude the testimony of Adel Alalfey for failing repeatedly to appear for deposition. Defendants present a compelling case as to why Alalfey's testimony should be barred and I shall grant the motion *in limine.*

To a very great extent, more than any other item of evidence, this case turns on the testimonial credibility of Adel Alalfey. Alalfey is a former agent for Baltimore Life. Alalfey understood from Baltimore Life that the company supported his plan to sell life insurance policies to his contacts in the Middle Eastern community in the Baltimore/Washington metropolitan area. Alalfey was himself a plaintiff in this case (represented by present plaintiffs' counsel) before I dismissed his claims on defendants' motion under Fed.R.Civ.P. 12(b)(6).

Alalfey is currently represented by plaintiffs' counsel in suits pending in the Maryland state courts arising out of his former employment with Baltimore Life. From the records submitted in the course of the instant litigation, Alalfey and Baltimore Life have been engaged for several years in an ugly series of suits and countersuits over charges of breach of fiduciary duty, race discrimination and the like.

Alalfey's deposition was first scheduled for February 17, 1999. Prior to noting the deposition, defense counsel telephoned plaintiffs' counsel on February 8, 1999, to inform them of the date. On February 15, 1999, plaintiffs' counsel belatedly informed defense counsel that Wendy Cartwright, Esq. would be representing Alalfey for

---

**3.** Section 2–209(c)(1) provides:

At least 30 days before filing a proposed examination report (3)27 the Commissioner shall give a copy of the proposed report to the person that was examined.

Md.Code Ann. Ins. Art. § 2–209(c)(1) (1997).

purposes of the deposition and that she and Alalfey were not available on the 17th. It is inexplicable as to why Alalfey, a former plaintiff in this case who is presently represented by plaintiffs' counsel in related litigation against Baltimore Life, would here feel the need for independent representation, other than to make more difficult the schedule of his deposition.

Soon after the aborted effort to depose Alalfey on February 17, 1999, Cartwright and defense counsel reached agreement to reschedule the deposition for March 9, and defense counsel notified plaintiffs' counsel that Alalfey would be deposed on March 9. Plaintiffs' counsel responded that they could not attend the deposition on March 9; thus, the deposition was rescheduled for March 10. Shortly before the deposition, Cartwright informed defense counsel that Alalfey had to stay at home with his children due to bad weather.[4] The deposition was promptly rescheduled for March 23, 1999.

On the afternoon of March 22, Cartwright informed defense counsel that Alalfey would not appear for his deposition on March 23 because he had to take his father to the doctor. That same afternoon, defense counsel received a letter from Cartwright confirming that Alalfey would not attend his deposition and alluding to defendants' failure to tender witness fees for any of the proposed deposition dates. Cartwright further stated that because Alalfey was concerned about the safety of his family as a result of the alleged unorthodox methods used by the process server to serve Alalfey with the deposition subpoena, he no longer consented to be deposed. Thus, the defendants have never deposed Alalfey, but the plaintiffs have tendered an affidavit from Alalfey in support of their opposition to the defendants' motion for summary judgment.

The inexcusable game-playing and bad faith manifested by Alalfey and plaintiffs' counsel in connection with defendants' efforts to depose Alalfey are of a piece with the regrettable history of gamesmanship and incivility that mark this case. Few courts have witnessed the odious behavior of counsel which has characterized the case at bar, the evidence of which is amply preserved in the record of the proceedings, both in the written submissions of counsel and in the transcripts of in-court proceedings, and need not be recounted here. In any event, I am satisfied that Alalfey's contumacious behavior, demonstrably designed and intended to bolster the plaintiffs' claims while erecting a bar to defendants' legitimate efforts to conduct reasonable discovery of important facts, should not be allowed to go unchecked. Exclusion of his testimony is a measured and appropriate response under the circumstances, and therefore the defendants' motion *in limine* is granted.

## FACTS

The material facts of the underlying dispute between the parties are undisputed in every essential respect. I am satisfied that no reasonable juror could conclude by a preponderance of the evidence that any plaintiff has been the victim of discrimination prohibited by 42 U.S.C. § 1981, and that therefore the motion for summary judgment should be granted.

Baltimore Life is the only mutual life insurance company domiciled in Maryland. The company is owned by its policyholders and managed for their benefit. In 1994, Baltimore Life hired Adel Alalfey as a sales agent to cover a targeted market— the Middle Eastern community in the Baltimore/Washington metropolitan area. It is undisputed that Baltimore Life, primarily through the efforts of Alalfey, sold many life insurance policies to persons of Middle Eastern descent. Specifically, during the 18-month period from November 1994 to April 1996, Baltimore Life sold life insurance policies to over 40 persons whose place of birth or ancestry could be traced to a Middle Eastern or Arab country.

---

4. There was a snow storm and schools were closed.

Shortly after Baltimore Life hired Alalfey, he met with Baltimore Life's Vice President of Underwriting and Claims, William L. Vigliotte, and discussed plans to sell life insurance to his targeted market. Vigliotte has been employed in the life insurance industry since 1972. He became an insurance underwriter for The Prudential in 1975 after completing an underwriting training program. In 1978, he left The Prudential and became a Senior Underwriter for Boston Mutual. From 1979 to 1992, he was employed by Keystone Provident, where he ultimately became the company's Chief Underwriter. In March 1992, he joined Baltimore Life as Chief Underwriter. In March 1994, he was promoted to Vice President of Underwriting and Claims. It was Vigliotte's overall responsibility to decide what risks Baltimore Life should assume.

Vigliotte attests that Alalfey informed him that he planned to sell life insurance to people from the Middle East, a plan wholly consistent with Baltimore Life's intentions. He states, however, that Alalfey specifically informed him that he had contacts at the Kuwaiti embassy in Washington, D.C., and Alalfey believed that he could sell life insurance policies to Kuwaiti employees who worked at the embassy. Vigliotte testified that Alalfey's comments regarding employees of the Kuwaiti embassy concerned him because of the likelihood that policies would be marketed to persons who may not be citizens of the United States and who were likely to return to their home country or "another relatively unstable nation." Vigliotte states that "[w]hen he told me about these plans for selling policies to employees of Kuwait, I was reminded of the Gulf War and the ongoing risk of residing in Kuwait, and I had visions of blindfolded Americans in captivity in Iran." Vigliotte says that he expressed to Alalfey his concern that these potential clients may pose an unacceptable risk if they planned to return to the Middle East.

After his conversation with Alalfey, Vigliotte cautioned his underwriting staff against providing life insurance to customers of Alalfey who were born in and remained citizens of unstable countries and consequently were likely to return home. Baltimore Life's application for life insurance does not ask applicants about citizenship. The application, however, does ask for information about "Country of Birth." Pursuant to Vigliotte's directions, therefore, between December 1994 and April 1995, the applications submitted by Alalfey for persons who were born abroad were checked by the underwriting staff to determine whether the applicant remained a citizen of his or her "Country of Birth." To obtain this information, an inquiry was made over the telephone by a telephone interviewer employed on the underwriting staff.

Among Alalfey's customers, the underwriting staff found only three applicants who continued to be citizens of their country of birth whom Vigliotte deemed represented unacceptable underwriting risks. Among the three were plaintiffs Sherif Saad and Nooshin Soozangar. The third individual is not a party to this case. Although the plaintiffs have failed to assert their claims in distinct counts, each only has standing to seek relief individually.

*Sherif Saad*

On December 22, 1994, Alalfey submitted the application of Sherif Saad for life insurance. It showed that he was born in Egypt and worked for the Kuwaiti government at its embassy in Washington, D.C. Pat Taylor, a staff member of the underwriting department telephoned Saad and learned that he was a citizen of Egypt. On December 30, 1994, Saad was notified by letter that his application for life insurance was rejected. The letter read, in pertinent part:

We have completed our review of the life insurance policy [sic] for which you recently applied. Unfortunately, we are unable to offer you coverage .... This case is being declined since it is compa-

ny policy not to issue coverage on non-United States citizens.

## Nooshin Soozangar

The second application Baltimore Life rejected was that of plaintiff Nooshin Soozangar. Soozangar applied for life insurance on December 29, 1994. Her application shows that she was born in Iran. Taylor telephoned Soozangar to determine whether she remained a citizen of that country. Upon learning that she remained a citizen of Iran, Baltimore Life also rejected her application, and she was so informed by a letter (which was identical to that sent to plaintiff Saad) dated January 11, 1995.

## Shagufla Azad and Ossama Nagy

It is undisputed that Baltimore Life has no record that plaintiffs Azad or Nagy ever applied to Baltimore Life for life insurance. Nor does Baltimore Life have any record that it ever took any action involving Azad or Nagy. (The affidavit of Alalfey—excluded on defendants' motion—confirms that these two plaintiffs did not complete any application or submit an application to Baltimore Life.).

Although plaintiff Azad acknowledged on deposition that she personally did not submit an application for life insurance, she believes that her husband did for her when her husband and child were issued policies by Baltimore Life in April 1995. She testified that her husband did not submit her application at the same time that he submitted an application for himself and their child because she is not educated and she was not allowed to have insurance. She testified that "[l]ater I told them if you want insurance as kind of an investment, then you go ahead and send my application too." She believes but is

not certain that her application was submitted sometime in June 1995.

Baltimore Life also has no record that plaintiff Nagy ever applied for life insurance. Nagy claims that he gave Alalfey an application in June 1995. He says that a few weeks later Alalfey told him that the company rejected his application.

Vigliotte attests that, meanwhile, in March 1995,[5] he read an article in an insurance trade journal that a company was being sued because it denied insurance to applicants who could not speak English. Concerned that Baltimore Life's practice might be improper, Vigliotte raised two issues at the April 3, 1995, meeting of Baltimore Life's Management Committee. Mark J. Ewing, Senior Vice President at Baltimore Life and Vigliotte's superior, recalls that in the course of the meeting, Vigliotte raised a question as to whether Baltimore Life should sell life insurance to people who are non-English speaking and, as a result, might be unable to understand the details and ramifications of the life insurance policy. He also recalls that Vigliotte, for the first time, informed the committee that Baltimore Life was receiving applications from people who were born abroad and that in his opinion there were underwriting risks associated with some of these applicants. Ewing says that Vigliotte noted particularly that Baltimore Life had rejected the applications of two individuals who were citizens of Middle Eastern countries. Ewing says that Vigliotte asked the committee for guidance and the committee referred the issues to in-house counsel. Although plaintiffs dispute Vigliotte's testimony, he states that Baltimore Life stopped inquiring about the citizenship of any applicant following the April 3, 1995, meeting.[6]

---

**5.** Vigliotte's affidavit actually states the date as March 1996. However, the remaining paragraphs of the affidavit and the arguments of the parties make it is clear that the correct year would be 1995.

**6.** Plaintiffs dispute Vigliotte's statement that Baltimore Life ceased inquiring into the citi-

zenship of applicants in or about April 1995. They have produced no substantial evidence that the practice continued beyond April 1995, however, the report prepared by the Commissioner indicates that two applicants were questioned about their citizenship after that date, one in 1996 and one in 1997. Nor

Although Vigliotte says that the practice of inquiring about an applicant's citizenship ended in April 1995, it is apparent that this was not communicated directly to Alalfey until April 1996 at a meeting of Baltimore Life sales agents.

As previously discussed, the Commissioner conducted an investigation to determine whether Baltimore Life had violated Maryland law during the period January 1, 1994 to June 30, 1997, by improperly considering applicants' citizenship in deciding whether to issue life insurance.[7] The report of that examination reflects that during that period, Baltimore Life processed 4,827 applications. The company approved 4,603 applications, declined 210, and postponed/rescinded 14. The examiners reviewed 228 randomly-selected approved applications, all of the declined applications and all of the postponed applications.

Of the applications reviewed, only 16 of the applications indicated a query was made regarding citizenship. The report gave the following breakdown as to citizenship of the 16 applications where such an inquiry was made: Bangladesh (1); Egypt (3); Jamaica (1); Korea (1); Nigeria (1); Pakistan (4); United States (5). The application dates for the 16 applicants were: 1994 (3); 1995 (11); 1996 (1); and 1997 (1). Of the 210 applications that Baltimore Life declined, the Commissioner found that all but ten were declined for valid medical reasons. The questioned ten applicants were denied for the following reasons: Criminal Record (6); Motor Vehicle Record (1); Lack of United States citizenship (3).[8]

The examiners concluded that Baltimore Life had not violated Maryland law. They wrote that "[u]nder [recognized underwriting criteria], individuals who are foreign nationals or individuals who travel to high risk countries are considered to be underwriting risks and, depending on the country, may be declined. The actions of Baltimore Life in connection with [the applications of plaintiffs Saad and Soozangar] appear[ ] to be consistent with th[ose criteria]. In any case, ... the Company subsequently offered insurance, and the individuals were not, therefore deprived of insurance."[9]

have the plaintiffs produced any evidence that applications written by any agent other than Alalfey were ever examined for citizenship status.

7. Maryland law prohibits an insurer from: (1) basing insuring decisions, in whole or in part on "race" or "creed;" (2) imposing or requiring "special conditions, facts, or situations as a condition" to the issuance of a policy of insurance that is "arbitrary, capricious, unfair, or discriminatory based wholly or partly on race ... [or] national origin;" and (3) "mak[ing] an inquiry about race ... or national origin in an insurance form, questionnaire, or other manner of requesting general information that relates to an application for insurance." *See* Md.Code Ann.Ins.Art. § 27–501(a)(1), (b)(1) and (c) (1997). Although, as discussed in text *infra*, it appears that Vigliotte's screening process may well have constituted an "arbitrary" denial of insurance in the manner in which he used *place of birth coupled with continuing citizenship* as a proxy for a measure of an applicant's likelihood of increased travel to certain countries, no plaintiff ever filed a complaint with the Commissioner.

8. Two of the declined applicants who were queried about their citizenship are two of the plaintiffs in this case, Saad and Soozangar.

9. As previously discussed in text, plaintiffs seek to controvert the Commissioner's exoneration of Baltimore Life, in part on the basis that the final, public report of the market conduct examination is the "second" report and that the "first" report was less favorable to Baltimore Life. This contention arises from testimony by Vigliotte in which he concedes that the Commissioner's proposed report was adverse to Baltimore Life, but that the final report found no violation. Relatedly, plaintiffs seem to contend that Baltimore Life falsely told the Commissioner's examiners that it had used a recognized and authoritative underwriting reference work, the so-called *Swiss Manual*, to review foreign-born individuals' applications, as a *post hoc* justification for its discriminatory refusal to insure non-citizens of Middle Eastern descent.

None of the plaintiffs' contentions in these regards, singly or in the aggregate, generates a genuine dispute of material fact foreclosing summary judgment. Whether Vigliotte physically examined the *Swiss Manual* or instead

## SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587, 106 S.Ct. 1348. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir. 1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds,* 517 U.S.

308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy,* 929 F.2d at 1012.

## ANALYSIS

*Legal Framework*

The plaintiffs' claims arise under 42 U.S.C. § 1981. Section 1981(a) provides as follows in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens ....

In *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the Supreme Court construed § 1981 to prohibit all racial discrimination in the making of private and public contracts. Thereafter, in *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), the Court concluded that the concept of race discrimination under § 1981 was intended "to protect from discrimination identifiable classes of persons who are subject to intentional discrimination solely because of their ancestry or ethnic characteristics." *Id.* at 613, 107 S.Ct. 2022. The Court noted a distinction, however, between ancestry or ethnic characteristics, on the one hand, and the place or nation of origin, on the other hand. The Court stated that to make out a claim of race discrimination under § 1981, the plaintiff there was required to prove that

(or in addition thereto) relied upon his accumulated knowledge after several decades of experience in underwriting, which was reflec-

tive of the principles contained in the *Swiss Manual,* is not material.

"he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his relation." *Id.*

In *Takahashi v. Fish & Game Commission*, 334 U.S. 410, 419, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), the Supreme Court noted that § 1981 had been interpreted to prohibit governmental discrimination against aliens. Subsequently, the Fourth Circuit, disagreeing with the Fifth Circuit, *see Bhandari v. First Nat'l Bank of Commerce*, 829 F.2d 1343 (5th Cir.1987) (en banc), *remanded*, 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989), *aff'd on remand*, 887 F.2d 609, 610 (5th Cir.) (per curiam), *cert. denied*, 494 U.S. 1061, 110 S.Ct. 1539, 108 L.Ed.2d 778 (1990), interpreted § 1981 as outlawing private discrimination against aliens. *Duane v. GEICO*, 37 F.3d 1036, 1043 (4th Cir.1994), *aff'g* 784 F.Supp. 1209 (D.Md.1992); *accord Anderson v. Conboy*, 156 F.3d 167 (2nd Cir.1998), *cert. granted sub. nom. United Broth. of Carpenters and Joiners of America v. Anderson*, —— U.S. ——, 119 S.Ct. 1495, 143 L.Ed.2d 650 (1999).

In *Duane*, plaintiff was a permanent resident alien of the United States and a citizen of Australia. Duane sought to purchase from GEICO a policy of homeowner's insurance and disclosed his citizenship status in doing so. 784 F.Supp. at 1211–12. GEICO would not issue him a policy because he was not a United States citizen. *Id.* When Duane spoke to a supervisory employee of GEICO, she confirmed that GEICO had a policy of refusing homeowner's insurance contracts to non-United States citizens. *Id.* at 1212. However, he was informed that if he purchased auto insurance he could obtain homeowner's insurance. After Duane filed a complaint with the Maryland Department of Licensing and Regulation, Insurance Division, GEICO offered Duane a policy. He declined the offer because he had already purchased a policy from another carrier. *Id.*

Duane filed suit in this court pursuant to 42 U.S.C. § 1981. GEICO moved to dismiss the action arguing that § 1981 applied exclusively to racial discrimination and Duane had alleged only discrimination on the basis of alienage. The court rejected GEICO's arguments and held that § 1981 prohibits private discrimination based upon alienage. *Id.* at 1219–20. On appeal, the Fourth Circuit affirmed. *Duane*, 37 F.3d at 1043.

■ Thus, as I have previously concluded in denying defendants' earlier motions to dismiss, and as the parties now agree, plaintiffs have stated cognizable claims of race and alienage discrimination under § 1981. The parties are not in agreement, however, as to whether plaintiffs' claims should be evaluated under the shifting burdens analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Defendants analyze the facts under the *McDonnell Douglas* scheme. Plaintiffs disagree, and contend that this is a case of direct evidence of discrimination. I agree with plaintiffs that there is no warrant under the facts of this case for the application of the *McDonnell Douglas* proof scheme.

■ This is a case involving direct evidence of discrimination. To overcome defendants' motion for summary judgment based upon direct evidence, the plaintiffs must "produce direct evidence of a stated purpose to discriminate on the basis of [ethnicity/citizenship] and/or circumstantial evidence of a stated purpose to discriminate on the basis of [ethnicity/citizenship] *of sufficient probative force to reflect a genuine issue of material fact.*" *EEOC v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992) (internal quotations and citations omitted) (emphasis added). Having fully considered the record and the parties' contentions, I am persuaded that plaintiffs have failed to project sufficient evidence of either race discrimination under *Saint Francis College v. Al–Khazraji* or alienage

discrimination under *Duane v. GEICO* to avoid summary judgment.

## Race Discrimination Claims

 As for any race discrimination claims based on a plaintiffs' Arab ancestry, all of plaintiffs' claims fail as a matter of law. The record is replete with evidence that many other persons of the same Arab ethnicity and from the same Middle Eastern countries obtained life insurance policies from Baltimore Life during the period December 1994 through April 1995. Thus, any claim of discrimination based on ancestry is fatally undercut. What distinguishes plaintiffs from the over 40 individuals of Arab ethnicity who obtained life insurance from Baltimore Life is the fact that they are not United States citizens.

Moreover, as defendants point out, the fact that Baltimore Life hired Alalfey with the declared purpose of marketing its product to the Middle Eastern community is at odds with an intent to discriminate against individuals of Arab ethnicity. Defendants correctly contend that this creates a strong inference that race discrimination was not a factor in rejecting such applicants for life insurance. See *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991) (where same individual who hired member of protected class later discharged employee, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer). Accordingly, no rational juror could reasonably conclude that plaintiffs are entitled to relief on the ground of race discrimination under § 1981.

## Alienage Discrimination Claims

 I shall turn, then, to plaintiffs' alienage discrimination claims. At least with regard to the two plaintiffs, Soozangar and Saad, whose applications Baltimore Life undeniably rejected, there is direct evidence of discrimination.[10] Vigliotte admits that he instituted a policy of rejecting applications from certain non-United States citizens. Clark, a former subordinate of Vigliotte, confirms that this was a practice at Baltimore Life. Indeed, letters expressly so-stating were sent to Saad and Soozangar over Clark's name to explain the rejection. Thus, plaintiffs have available a quantum of evidence supportive of their claims.

Nevertheless, even as this evidence is viewed, as it must be, in the light most favorable to plaintiffs, the probative force of that evidence must be assessed in the light of the whole record. Significantly, there is also substantial direct evidence that Saad and Soozangar were denied insurance policies solely because they retained their citizenship in Egypt and Iran, respectively, and not solely because they were aliens. Vigliotte testified, without contradiction, that:

> [B]eginning in] December 1994, the staff of my underwriting department began checking whether any of Mr. Alalfey's applicants for life insurance, who were born in a foreign country, remained a citizen of that country. *I directed that this action be taken to safeguard the company from unacceptable risks involving people who would likely return to countries like Kuwait, Egypt, or Iran, because they were born there and remained citizens there.* Information about whether the applicant remained a citizen of that country was obtained by telephone interviews of the applicants conducted by a member of our staff ... I subsequently received from my Underwriting Staff the files of Sherif Saad and Nooshin Soozangar, and I reviewed these files. Dr. Saad's filed showed that he was born in Egypt and worked for the Kuwait government ... The file fur-

10. As a matter of law, because they have not established that Baltimore Life in fact rejected their applications, plaintiffs Nagy and Azad fail to project evidence sufficient to support their claims of alienage discrimination. Nevertheless, the reasoning employed in text as to the remaining plaintiffs would apply with equal force to their claims of alienage discrimination.

ther showed that he ... was a citizen of Egypt. Mrs. Soozangar's file showed that she was born in Iran and ... was a citizen of Iran ... *I concluded that both of these applications were correctly declined because of the unacceptable risk that Dr. Saad would return to Egypt and that Mrs. Soozangar would return to Iran.* (emphases added).

■■■ On the whole, although there is admittedly some direct evidence that Baltimore Life rejected the plaintiffs *in part* because they were citizens of certain Middle Eastern countries, i.e., they were not citizens of the United States (or some other country), Baltimore Life nevertheless escapes liability as a matter of law because a rational juror would be compelled on this record to conclude that, rather than noncitizenship, plaintiffs' rejection was "solely" based "on the place or nation of [their] origin," *see Saint Francis College,* 481 U.S. at 613, 107 S.Ct. 2022, rejection on the basis of which does not support a cognizable claim under § 1981. Put differently, the undisputed evidence demonstrates that in rejecting the applications of Saad and Soozangar, Baltimore Life—and specifically Vigliotte—acted on the basis of the plaintiffs' "place of origin," i.e., the fact of *continuing citizenship* in Iran and Egypt, as a proxy for an explicit determination that they were likely to travel extensively in those countries, which indisputably were experiencing civil strife (the presence of which imposed a measurable underwriting risk), and thus undermines the plaintiffs' claim that it was the fact of their *non-United States citizenship* which was Vigliotte's true and actual motivation for denying them insurance coverage. Proof of disparate treatment *among aliens* is not, without more, unlawful discrimination on the basis of alienage violative of 42 U.S.C. § 1981. *Cf. Espinoza v. Farah Mfg. Co., Inc.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973).[11]

Defendants submitted substantial undisputed evidence that an insurer's decision to take into account in its underwriting practices the likelihood that an applicant would spend significant time in certain countries of civil unrest or instability was rationally related to the business of insurance. In addition to the Commissioner's report, defendants offered Maureen Moreau as an expert qualified in the business of insurance underwriting.[12] Although admittedly some of her statements may exceed the lawful bounds of federal and state antidiscrimination law, Moreau supported the legitimacy of Baltimore Life's policy of denying life insurance to certain non-United States citizens. The fact that Moreau was not familiar with the facts of this case

---

**11.** In *Espinoza,* Justice Marshall clarified the distinction between disparate treatment on the basis of national origin, on the one hand, and disparate treatment on the basis of alienage, on the other hand. Only the former is prohibited by Title VII of the Civil Rights Act of 1964. He wrote:

The question posed in the present case, however, is not whether aliens are protected from illegal discrimination under the Act, but what kinds of discrimination the Act makes illegal. Certainly it would be unlawful for an employer to discriminate against aliens because of race, color, religion, sex, or national origin—for example, by hiring aliens of Anglo–Saxon background but refusing to hire those of Mexican or Spanish ancestry. Aliens are protected from illegal discrimination under the Act, but nothing in the Act makes it illegal to discriminate on the basis of citizenship or alienage.

414 U.S. at 95, 94 S.Ct. 334. Similarly in the present case, nothing in *Duane* or any other authority brought to my attention prohibits an insurer's disparate treatment of aliens on the basis of where and how often an alien is most likely to travel when she is outside the United States. Throughout this case, plaintiffs have, understandably, focused the bulk of their energy on generating proof, as hypothesized by Justice Marshall in the Title VII context, that they were afforded disparate treatment on the basis of ancestry, not on the basis of alienage. For the reasons stated in text, such "race" claims fail as a matter of law.

**12.** Moreau has been involved in the insurance business for more than 30 years and was Vice–President of Underwriting for the firm which produced the *Swiss Manual.*

does not weaken the force of her testimony.

She described her involvement in updating the authoritative *Swiss Manual* and how she arrived at the policies in the manual regarding insuring non-United States citizens and people who travel to other countries. Moreau testified that citizenship in a foreign country is a relevant factor that is considered by underwriters in deciding whether to provide life insurance to a person. She testified further that she and her staff would compose a list of high risk countries by evaluating State Department bulletins. She said that the person who is a citizen of another country would be more likely to travel to that country. Further, she testified that to assess risks for foreign travel, questions not on an insurance application would need to be answered, such as how long a person has been in the United States and whether he or she is a United States citizen.

Plaintiffs attempt to rebut this evidence by trying to show Baltimore Life's disparate treatment between the handling of their applications and that of an allegedly white South African citizen. This is consistent with their focus on the issue of race. The unauthenticated documents tendered by plaintiffs reflect that a South African doctor, Wagener, applied for life insurance from Baltimore Life in May 1995. Although it is not clear from the documents, it appears that Wagener is a citizen of South Africa. Ironically, the letter he submitted with his application appears to stress that he has the intention of permanently residing in the USA and will visit his home country for vacation only. Thus, this evidence actually undercuts plaintiffs' intended use of it as probative of unlawful discriminatory treatment because the applicant seemingly undertook to show a *small* likelihood that he would travel to South Africa for extended periods, thus lowering any perceived risk.

In any event, plaintiffs contend, without support in the record, that Wagener's application was approved by Baltimore Life. There is, however, nothing in the record clearly establishing that he is white, that he is a citizen of South Africa, or even that he obtained life insurance from Baltimore Life. Because there is nothing in the record to establish the authenticity of the documents or the statements made therein, plaintiffs cannot rely on them to support their case against Baltimore Life.

In short, given the state of the record, a reasonable jury could not reasonably conclude that Baltimore Life intended to deny insurance to plaintiffs solely because they were non-United States citizens. To be sure, Vigliotte operated with a meat axe rather than with a surgeon's scalpel. As I suggested at the hearing, it seems irrational in the extreme to offer to issue (and actually to issue) insurance policies covering an entire family, including one parent and the children, but to withhold coverage from a parent/spouse on the asserted basis that the excluded spouse, retaining citizenship in a country of birth identified as a troubled locale for underwriting purposes, is likely to travel there *more frequently* than her intimate family members. But this is exactly the regime that Vigliotte implemented at Baltimore Life for a short period of time. The prohibition in Maryland law of "arbitrary" refusals to insure might well be implicated in this respect. *See supra,* n. 7.

Nevertheless, the plaintiffs have not argued, and I am aware of no authority for the proposition, that § 1981, in contrast to state law, protects against disparate treatment of insurance applicants based on unwise or even irrational grounds. To the contrary, in the unique posture of alienage discrimination claims under § 1981, I understand the law to protect against solely intentional discrimination on the basis of non-United States citizenship.[13] Because

13. Plaintiffs have not argued, and thus I have not sought to determine, whether a "mixed-motive" analysis would be appropriate in the

context of an alienage discrimination claim under § 1981. That is, although plaintiffs have argued that they are entitled to relief on

plaintiffs have failed to project sufficient evidence supporting a reasonable conclusion that Vigliotte so acted, defendants are entitled to judgment as a matter of law, notwithstanding plaintiffs' colorable showing of alienage discrimination.

*Damages Issues*

In their prayer for relief, plaintiffs seek damages for embarrassment, humiliation, indignity, distress and injury to their reputations. And, for the first time, plaintiffs in their opposition assert that they sought to purchase life insurance from Baltimore Life for investment purposes. Defendants contend that plaintiffs have failed to show that they suffered any actual damages, that they have failed to demonstrate that they suffered emotional distress proximately caused by the rejection of their applications [14] and that, in any event, plaintiffs failed to mitigate damages.[15]

I wholly agree with these contentions. If called upon to adjudicate the question on the present record, I would be constrained to conclude as a matter of law that no plaintiff would be entitled to any recovery other than nominal damages of one dollar. Moreover, for the reasons discussed at p. 827, *supra* regarding the performance of all counsel in this case, any appropriate award of attorney's fees to any prevailing party under 42 U.S.C. § 1988 would be zero. *Cf. Sheppard v. Riverview Nursing Center, Inc.,* 88 F.3d 1332 (4th Cir.), *cert. denied,* 519 U.S. 993, 117 S.Ct. 483, 136 L.Ed.2d 377 (1996).

## CONCLUSION

For the reasons stated herein, I shall grant defendants' motion for summary judgment. An order follows.

---

both race and alienage grounds, each of which, if proved, would independently support a judgment in favor of plaintiffs, plaintiffs have not argued that a mixed motive—rejection partly on permissible grounds and partly on impermissible grounds, would support an award in their favor. *Cf. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (mixed motive analysis as to First Amendment claim); *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (mixed motive analysis as to unfair labor practice claim); *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (mixed motive analysis as to employment discrimination claim under Title VII of the Civil Rights Act of 1964).

**14.** Plaintiffs' testimony regarding the emotional distress they suffered as a result of the alleged discrimination is remarkably weak and does not rise to the level of a scintilla. Plaintiffs testified that they never saw a doctor nor took prescribed medicine as a result of any inability to obtain life insurance from Baltimore Life. Saad (who is not entitled to relief in any event) testified that he was "really disappointed" about not getting life insurance from Baltimore Life and to relieve his disappointment, he relaxed at home. Soozanger said that she was upset and talked to her husband about this all of the time. Nagy (also not entitled to any relief) testified that it affected his ability to work as a used car salesman. He testified that he lost sleep and was upset.

**15.** Defendants contend that plaintiffs had a duty to mitigate damages (by seeking policies from other companies) and failed to do so. *See Ford Motor Co. v. EEOC,* 458 U.S. 219, 231–32, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982); *Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1273 (4th Cir.1985); *Young v. Parkland Village, Inc.,* 460 F.Supp. 67, 71 (D.Md.1978). In fact, Soozangar mitigated damages. *In April 1996, Soozangar obtained life insurance from Baltimore Life through Alalfey.* Nagy was offered life insurance by his employer in September 1998, but he declined the offer. Azad testified that she did not apply for life insurance with any other company. Baltimore Life specifically offered Saad, Nagy, and Azad insurance coverage during the pendency of this case but they declined.